ARKADELPHIA LUMBER COMPANY *v.* THORNTON.

Opinion delivered July 1, 1907.

1. FRAUD—MISREPRESENTATIONS NOT RELIED UPON.—A sale of land will not be rescinded for misrepresentations of the vendee which were not relied upon by the vendor. (Page 413.)

2. SAME—EQUALITY OF MEANS OF INFORMATION.—When the means of information are at hand and equally open to both parties, and no concealment is made or attempted, a misrepresentation by one of the parties to a contract of sale furnishes no ground for equity to refuse to enforce the contract. (Page 413.)

3. SPECIFIC PERFORMANCE—PART PERFORMANCE.—Proof that the vendee of land under a verbal sale paid the purchase money therefor and took possession thereunder by renting the land to one person

and selling the growing timber to another is sufficient part performance to entitle the vendee to specific performance of the contract. (Page 414.)

4. AGENCY—DELEGATION OF AUTHORITY.—A sale of land executed by a subagent will be enforced as against the principal where the subagent merely acted as the exponent of an authorized agent, and where the latter fully ratified what was done by the agent. (Page 415.)

Appeal from Dallas Chancery Court; *Emon O. Mahony,* Chancellor; affirmed.

### STATEMENT BY THE COURT.

This suit was brought by the Arkadelphia Lumber Company against John W. Mann in the Dallas Circuit Court to replevy a lot of staves. Mann answered, denying the allegation of the affidavit for replevin, and made his answer a cross bill, alleging that W. B. Head, being the owner of the land on which the staves were made prior to the making of the same, sold and delivered said land to him for the agreed price of $300, and placed him in possession of same, and then and there agreed to make him a deed upon the payment of the purchase money within thirty days. That within the thirty days he paid the purchase money to Head and demanded a deed, which he refused to make. That afterwards, and while he was in possession of the land exercising acts of ownership and control over the same, Head, confederating with the Arkadelphia Lumber Company to cheat and defraud him, fraudulently sold to it the pine and oak timber on the land, and executed a deed to it, and that this deed is a cloud on his title. That at the time of the execution of this timber deed the plaintiff well knew that Head was not the owner of the land or timber, but knew that defendant was the owner and in actual possession, and exercising acts of ownership over the same. He asked that the cause be transferred to the chancery court, that Head be made a party, and that he be compelled to execute a deed to defendant for said land. W. Burres Head was made a party defendant. The cause was transferred to equity.

The Lumber Company answered the complaint of Mann, and made its answer a cross complaint against Mann and W. Burres Head. It denied that Mann purchased the lands from Head, that Head placed him in possession, or that he was ever

rightfully in possession; denied that it confederated with Head to cheat and defraud Mann. It alleged that the pretended contract between Head and Mann was verbal; that it was void under the statute of frauds. That in April, 1902, Mann represented to it that he owned said land, and sold the pine timber thereon to it for $500, and received its two checks for $300 and $200; that the $200 check was paid by it. That, after receiving the timber deed and paying the check for $200, it discovered that Mann had no title to said land or the timber thereon, so it purchased the pine and oak timber from W. Burres Head, acting for himself and as attorney in fact for the other heirs of his father, W. B. Head, deceased, and paid therefor $350. It prayed for judgment against Mann for $200 paid to him for timber he did not own, and that the $300 unpaid check be cancelled, and, in the alternative, for judgment against Head for $350 for failure of consideration, if it be held that the title to the lands had previously been legally contracted to Mann.

The heirs of W. B. Head, besides W. Burres Head, are Mrs. Virgie Smith, Mrs. Rivers, Hearon, Olive, and Bertha Head. The widow was Mrs. Della Head.

The defendant W. Burres Head answered and made his answer a cross bill against Mann, and alleged that he was not the sole owner of the lands in controversy, but that same was owned by him jointly with the other heirs of the W. B. Head estate. As to the attempt of Mann to purchase said land, he admitted that there had been negotiations looking to that end, but no deed was executed, possession given, or money paid under the alleged purchase. That said negotiation for said purchase between Mann and this defendant was through Pledger, his agent. That Pledger had no power of attorney to sell, and whatever agreement was entered into with him was subject to approval by this defendant. That, if said negotiations amounted to an agreement to sell, the same was void because induced by the false, fraudulent and wilful misrepresentations of Mann, as to the timber upon said lands, which was a material element in said agreement, and caused this defendant to sell said lands for less than their real value. He alleged that the contract was by parol, and pleaded the statute of frauds. That Mann entered wrongfully into the possession of said lands and without au-

thority collected rents from Head's tenant. He prayed for an accounting by Mann as to the rents collected by him.

This was the state of the pleadings when the cause first came to this court. *Arkadelphia Lumber Co.* v. *Mann,* 78 Ark. 414. On that appeal the cause was reversed, because the defendant did not make all the owners of the land against whom a specific performance of the contract of sale was sought parties to his cross complaint. On the second trial this was done by making the other heirs of W. B. Head, deceased, parties. The cross complaint was amended by alleging that W. Burres Head and the other heirs named *supra* were the owners of the land from which the staves were cut. It was alleged that W. Burres Head, by virtue of a power of attorney executed to him by the other parties named above, sold and delivered the land to John W. Mann. The additional parties filed their separate answer, in which they admitted their ownership of the lands in controversy, adopted the answer of their co-defendant, W. Burres Head, denied all of the material allegations of the cross complaint, and especially denied that Pledger had any authority from them to sell, contract to sell or to deliver possession of said lands to said Mann, or to any one else, or to accept payment therefor.

The case was tried the second time in the chancery court upon the same testimony and admissions as in the first trial. Since the first trial however, Mann has died, and the cause was revived in the name of his administrator, the present appellee.

John W. Mann testified as follows: "In the spring of 1902 I received the following letter from W. B. Head: 'Mr. J. W. Mann, Dear Sir: I sent word to Pledger to sell you the land some time ago. I suppose he has seen you by this time.' Pledger came to me on the 24th of March, 1902, and told me that he had received a letter from Head, telling him to see if he could sell me his place. I offered him $300. He said he would not accept it without examining the land. We agreed to, and did, meet on the land in controversy the next morning, and went over and examined it. Mr. Shankles, who also wanted to buy the place, and Mr. Brown, who wanted to rent it, went with us. Brown was going to a log rolling, and wanted to know something definite whether he could rent the place for

next year or not, and it was then and there agreed between Pledger, Shankles, Brown and myself that whoever the place fell to should let Brown have it. Shankles was to meet us at Wozencraft's if he concluded to raise my bid, but did not come, and Pledger and myself closed the trade for the land. The agreed price was $300 to be paid in 30 days, and left with Sorrells. I deposited with Sorrells the check of the Arkadelphia Lumber Company for $300, this mode of payment being agreed on between Pledger and myself. Pledger agreed at the time to have a deed executed by Head in 30 days and delivered to me, and at the time turned over the place to me, and I rented it to Brown for ten dollars. I made no false or fraudulent representations to Pledger or Head regarding the timber on the land. On the other hand, Mr. Pledger went over the timbered portion of said land prior to the sale and made his own estimates of the same. The trade was absolute, Pledger claiming to have full authority in the matter. On the day I deposited the check Pledger told me that he had received a letter from Head ratifying the trade, and saying it was all right. There are 280 acres of land in the tract. Pledger only went through one end of the bottom land. There was some oak in the bottom, but it was principally red oak. I have never received any deed from Head. When I sold the pine timber to the defendants, I told them that I had bought the land and had a right to sell. At the time I bought this land I had not been on it in 15 years except to pass along a road that runs through it. All the choice oak timber had been cut when I bought. Red oak had no market value. When the trade was made, and I was talking about renting out the place and selling the timber, Pledger said: 'Go ahead and do it. My word is my bond. I don't care if you make a thousand dollars out of it.' The word possession was not used, but he did say 'I don't care what you do with the place.'"

It was shown that Mann deposited with Sorrells a draft for $300 of the Arkadelphia Lumber Company in payment for the land. He gave Sorrells the numbers of the land and instructed him that when the deed came, if it was correct, to turn over the draft to Pledger. Sorrells still had the draft. A witness testified that he was present when Pledger sold the land

to Mann, and it was agreed that Mann might pay the purchase in a check of the Arkadelphia Lumber Company, and that same was to be delivered to Sorrells. ,

Brown testified as follows:

"I was present when Mann, Pledger and Shankles were talking about the place. It was agreed between the three that whoever bought the place would rent it to me, and if it was not sold that Pledger would rent it to me. In accordance with this agreement, I rented the place from Mann and took possession of it. Neither Mr. Pledger or Mr. Head have ever objected to my renting the land from Mann, nor has either of them objected to my occupancy of same, nor have they claimed any rent. When I left them, there had been no sale. I afterwards learned of it from Pledger."

W. H. Henry testified: "I am well acquainted with the land in controversy, and have been for 25 years. I own land on two sides of it. In November, 1900, the father of W. B. Head bargained this land to a party for $280 on a credit. He was stricken with paralysis next morning before the trade could be completed. In the fall of 1899 W. B. Head sold all of the white oak on this land to the Hamlin Stave Company, and they cut all of the stave timber off of it prior to 1903. Red oak had no value at this time. In '97 or '98 the Eagle Lumber Company bought the pine timber off of this land and cut and hauled it off."

J. T. Shankle testified: "Was present when Pledger and Mann went to look at the land. They did not go over the timbered land in the bottom. Mann asked Pledger if he wanted to go into the bottom to ascertain how much gum there was that would make staves; that there was no oak timber, as that had been cut. What he said about the gum seemed to have been said as a joke."

Oscar Pledger, for appellants, testified:

"Head wrote that Shankle had written him, and Mann had 'phoned him, proposing to buy the land. He requested me to see them. Mann offered me $300. I told him I did not know anything about the place nor how much timber was on it. I met them on the land. We proceeded to the edge of the bottom field, to where Mann said he supposed the line was. He asked

me if I wanted to go in the bottom to see how much gum there was that would make staves. I asked him how much oak timber there was in the bottom. He said it had been cut; that there was none to amount to anything. It had rained recently, and it was wet and muddy in the bottom. I told Mann if he said there was no timber in the bottom I would take his word for it. Brown wanted to rent the place from whoever bought it. Both Mann and Shankle (said) that if either bought it he would rent it to him, and I said I would rent it to him if I did not sell. Mann asked me, provided we traded, if Head would accept a check on a St. Louis bank. I told him I did not know. We agreed to meet again at Wozencraft's store. Mann and I waited there for some time for Shankle. He did not come. I then told Mann I would take $300, and would give him a month to get up the money. I wrote to Head, and he wrote me the following letter.

" 'March 27, 1902.

" 'Dear Oscar:

" 'I think you sold the 'Chandler place' for all it is worth. Close up the trade as soon as you can, and I will make the deed.

" 'W. Burres Head.'

"About two weeks after the sale Mann wrote me he was ready to pay for the place when Head sent the deed. About this time I wrote to Head that I thought that Mann had misrepresented the timber. Several days afterwards Mann brought to me a $300 check, and asked about the deed. He asked how it would do to leave the check with me. I told him he had better keep it till he saw whether the deed came up all right. I deny that I authorized him to take possession of the land."

W. Burres Head on behalf of appellants testified substantially as follows: "My father (W. B. Head) died intestate, owning the land in controversy. The names of his heirs are: Mrs. W. B. Head (the widow), Mrs. R. J. Smith, Mrs. J. W. Hearon, Miss Olive Head, Miss Bertha Head and myself.

"Mann called me up from Fordyce February 21, 1902. He asked what I would take for the 'Chandler Place' I asked him if there was any timber on the land. He said no, that my father had sold the timber. I refused to make him a price then. I asked him what he wanted with the land. He said to pasture

it, and also wanted to get ready for a crop. I asked him above questions because I was suspicious that there was timber on the land, because he called me up from so great a distance over the long distance telephone, instead of writing to me. In March I wrote to Pledger to look at the 'Chandler Place.' I told him Mann had offered me $300, and that if there was no timber on the land the price was reasonable, for I remembered to have heard my father say that the timber was about all there was on the land that was valuable. Pledger wrote me about his trade with Mann. When I went to make the deed to Mann, in taking out the old deeds to my father, I found a slip of paper in the deed which said, 'Pine timber sold. Oak timber valuable.' (Witness wrote to Mann that "the Chandler Place" contained 320 acres.) I did not know that Mann was trying to deceive me, and thought possibly he did not know that there was timber of any value on the land. In June, 1902, I sold the timber on the land to the Lumber Company for $350, and made a timber deed. I did not know, at that time, that the Lumber Company had paid Mann any money for the same timber, though Pledger had written me that Mann claimed to have sold the timber to the Lumber Co. I never made Mann a deed. I and the other owners of said land never made Pledger a power of attorney authorizing him to sell said lands to any one. We never authorized him to deliver to Mann the possession. All of the other heirs of the estate of W. B. Head, deceased, made to me a power of attorney authorizing me to sell the lands and timber.

A. E. Littlejohn, for appellants, testified:

"As agent for the Lumber Company, I bought from Mann the pine timber on the lands in controversy, and agreed to pay him $500. I gave him two checks drawn by the Lumber Company, one for $300 and one for $200. He executed and delivered to the Lumber Company a timber deed. About a month after the deed was made, Mann said to me that Head had refused to make him a deed to the land, and asked me what he should do about it. I told him he could give up the deed. In June, 1902, I bought for the Lumber Company the pine and oak timber on said lands from Head, as attorney in fact for the W. B. Head estate, and paid him $350 for same. The Lumber

Company did not take possession until after the purchase from Head. Before Mann made the deed, he said that he was on a trade for the lands and wanted to know how much I would give for the pine timber. I told him $500. He saw me again and said he was ready to make the deed. I would estimate the oak timber on the land to be worth two or three hundred dollars."

Appellants introduced in evidence the deed for the pine timber from Mann to Lumber Co., which contained no covenants of warranty, also the deed for pine and oak timber from W. Burres Head to the Lumber Company, which also contained no covenants of warranty. The deed commenced "Know all men by these presents: that I, W. Burres Head, attorney in fact for the W. B. Head estate," etc.: signed, "W. Burres Head."

A deed from A. R. Launius and wife to W. B. Head, conveying to the latter the "Chandler Place," containing 320 acres, was made an exhibit to W. Burres Head's deposition. A power of attorney from the heirs of W. B. Head to W. Burres Head authorizing the latter to sell the land in controversy was also in evidence. The court found as follows:

That in March, 1902, W. Burres Head, acting through his agent, Pledger, agreed to sell said lands to Mann for $300, to be paid by draft, to be deposited with J. B. Sorrells. That Mann has complied with his part of said contract, and that Head has not complied therewith. That, while said contract was verbal, it was in part performed by placing the vendee in possession and depositing the check as agreed. That Head, at the time he agreed to convey said lands, had a power of attorney from the widow and other heirs of W. B. Head, deceased, authorizing him to sell said lands. That Mann did not deceive Head or his agent, and did not perpetrate a fraud on either of them or on the heirs of W. B. Head, deceased. That Mann was entitled to a specific performance of said contract. That the money in the registry of the court should be paid to Mann. The court also found, that on April 9, 1902, the Lumber Company purchased from Mann the pine timber and received a timber deed therefor, and agreed to pay for same $500, and delivered to him two checks for $200 and $300. That the check for $300 was tendered to Head's agent in payment for said lands, and was refused, and same was placed in the hands of

Sorrells. The court further found, that said Head, acting for himself, and as attorney in fact for the W. B. Head estate (afterwards) sold the pine and oak timber to the Lumber Company for $350 and executed a deed for same. That said Head has received $50 more than he agreed to sell said lands for to Mann, and that the Lumber Company in the said two transactions had paid $50 more than it first agreed to pay said Mann, which amount the Lumber Company should recover from Head. That the consideration for the sale of the pine and oak timber from said Head to the Lumber Company has failed. That $300 of the amount paid by it to Head should be considered as in satisfaction of the purchase money, both in the sales from Head to Mann and from Mann to the Lumber Company. The decree was in accordance with the findings, to which both the Lumber Company and Head excepted, and both prayed and were granted appeals to this court.

*John H. Crawford,* for the Lumber Company; *W. E. Patterson,* for other appellants.

1. The fact that Mann originally in his cross complaint only included W. Burres Head, and testified that he contracted with him, without naming others, shows conclusively that he understood that he was buying the lands from W. Burres Head alone. This court can not make a contract between Mann and the other heirs of W. B. Head and then specifically enforce it. 63 Ark. 100.

2. The power of attorney from the other heirs of W. B. Head, deceased, to W. Burres Head, did not authorize the latter to appoint a substituted agent, Pledger, with power to sell or otherwise dispose of the lands. 70 Ark. 351. Pledger's authority was merely an agency to find a purchaser and agree upon terms of sale to be approved by Head. In dealing with him Mann was bound to inform himself as to the extent of Pledger's authority. 74 Ark. 557.

3. If Pledger placed Mann in possession, his act in so doing would not have bound Head without his ratification, and there was no ratification. There was no verbal or written authority so to do. 51 Ark. 483; 24 S. E. 259; *Id.* 261; 85 Cal. 418.

*R. C. Fuller* and *Thornton & Thornton,* for appellee.

WOOD, J., (after stating the facts.)    Appellants stress two propositions for reversal:

1.    That fraudulent representations of Mann as to the timber on the land will defeat specific performance.

2.    The statute of frauds.

1.    We do not find any fraudulent representations made by Mann that would warrant a court of equity in refusing him the specific performance of his contract for the sale of the land in controversy.    It is not specifically alleged that Mann made fraudulent representations to W. Burres Head in person.    The charge is that said negotiations for said purchase between Mann and this defendant were through Pledger, his agent; that, if said negotiations amounted to an agreement to sell, the same was void because induced by the false, fraudulent and willful misrepresentations of Mann as to the timber upon said lands. The testimony of W. Burres Head to the effect that on February 21, 1902, Mann told him that there was no timber on the land, and that he, Mann, wanted to pasture and cultivate the land, was not responsive to any allegation of fraudulent representation made in the pleading.    Moreover, if such testimony were responsive and should be considered, the further testimony of Head shows that these representations did not move him to make the contract of sale.    For he says: "I refused to make him a price then.    * * *    I was suspicious that there was timber on the land.    I wrote to Pledger in March to look at the Chandler Place.    I told him Mann had offered me $300, and that if there was no timber on the land the price was reasonable." This testimony shows that Head did not rely upon Mann's statement, even if he made it, concerning the timber, but, on the contrary, that Head would not price the land or enter upon the negotiations until his special agent, Pledger, had "looked at the place."    The contract of sale was therefore not affected by these representations.    *Winter* v. *Bandel,* 30 Ark. 373; *Matlock* v. *Reppy,* 47 Ark. 48; *Neely* v. *Rembert,* 71 Ark. 91.

Pledger testified that Mann represented to him "that the oak timber in the bottom on the land had been cut; that there was none to amount to anything."    It is contended that this representation by Mann was false, and should defeat his action for specific performance.    This representation was shown not

to be false.  Mann swears that all the choice oak timber had
been cut at the time he bought, that the red oak had no market
value at that time, and that the oak that was in the bottom at
the time he made the statement was principally red oak.  Mann
is corroborated in his statement that the white oak timber had
been cut by witness Henry, who says that the Hamlin Stave
Company had bought and cut the stave timber on the land prior
to 1903.  He is also corroborated by witness Shankle, who says
that Mann asked Pledger, while they were on the land, if he
wanted to go into the bottom to see "how much gum there was
that would make staves; that there was no oak timber, as that
had been cut."  This testimony tends to show that Mann, when
he made the statement that all the timber in the bottom had
been cut had reference to the timber that would make staves,
the white oak timber that was the only oak timber of value.
This representation of Mann is not shown to be false and made
with the intention of deceiving Pledger and inducing the con-
tract of sale.  Pledger had no right to claim that he was deceived
by it.  He was specifically directed to look at the land for the
purpose of ascertaining its timber value, and had gone upon
and inspected it for that purpose.  No one was restraining him
from further investigation.  The way was open to him, as much
so as to the purchaser.  He was representing the absent owner,
and his duty was to find out about the timber.  He was deal-
ing with the purchaser "at arm's length."  When the means of
information are at hand and equally open to both parties, and
no concealment is made or attempted, the language of the cases
is "that the misrepresentation furnishes no ground for a court of
equity to refuse to enforce the contract of the parties."
*Slaughter* v. *Gerson,* 13 Wallace, 379; 1 vol. Crawford's Digest,
424, f.

2.  The uncontradicted proof shows that there was a ver-
bal sale of the lands in controversy.  Head swears that he wrote
to Pledger to look at the "Chandler Place;" that Mann had
offered three hundred, and that the price was reasonable, "if
there was no timber on the place."  Again he says: "Pledger
wrote me about the trade with Mann."  Again: "When I went
to make the deed to Mann," * * *. . This testimony by one
of the vendors, and the agent for the others clothed with power

of attorney, shows that the "trade was made." Head's letter in reply to letter of Pledger, his special agent to carry on the negotiations, shows that he had been informed fully of the terms and conditions of the sale, and understood them and ratified them, for he wrote, "I think you sold the Chandler place for all it is worth. Close up the trade as soon as you can, and I will make the deed." Here was written authority to the special agent "to close up the trade" as soon as he could, which the special agent proceeded to do, as the proof shows, by directing the payment of the purchase money in check on the Lumber Company to be deposited with a certain party to await the arrival and delivery of the deed, and by authorizing the vendee in the meantime to take possession, telling him "to go ahead," that he did not care what "he (the vendee) did with the place." The vendee, as the proof shows, fulfilled the requirements of the vendor as to the payment of the purchase money by depositing the check as requested, and proceeded to take possession in pursuance of the contract of sale, and in consummation of same, acting upon the authority given by the vendors. Mann took possession by renting the land to Brown, and by selling and otherwise utilizing the timber. The facts proved as to the payment of the purchase money and the taking of possession meet every requirement of our decisions as to the part performance of the parol contract necessary to give the vendee, Mann, the right to specific performance and to put his case out of the operation of the statute of frauds. *Keatts* v. *Rector,* 1 Ark. 391; *McNeill* v. *Jones,* 21 Ark. 277; *Kellums* v. *Richardson,* 21 Ark. 137; *Pindall* v. *Trevor,* 30 Ark. 249; *Terry* v. *Rosell,* 32 Ark. 478; *Sutton* v. *Myrick,* 39 Ark. 424; *Moore* v. *Gordon,* 44 Ark. 334.

The owners of the land in controversy were residents of Texas at the time the power of attorney was executed authorizing W. Burres Head to sell same. The land being situated in Arkansas and Head, the agent authorized to sell same, being in Texas, it may be fairly presumed that the owners in executing the power of attorney contemplated that W. B. Head would employ a subagent to find a purchaser, and to perform the other merely incidental and ministerial acts necessary to consummate the sale of the land if made to a purchaser in this State. Pledger was

but the instrument through whom W. Burres Head acted, and the acts of Pledger were only the acts of Head. Pledger did not make the sale, but only carried out the instructions of Head, who did make it. Pledger was not vested with any authority or discretion of his own, but only acted as the exponent of Head to do the things which, on account of the exigencies of the situation, Head could not do in person. *Penwick* v. *Bancroft,* 56 Iowa, 527; Mechem on Agency, § 1934 and cases cited in note; 1 Am. & Eng. Enc. Law, 980, and cases cited in note; Tiffany on Agency, 119. But if the acts of Pledger were unauthorized, Head, after being informed of them, fully ratified what had been done, as his letter to Pledger proves. The facts in the case of *Bromley* v. *Aday,* 70 Ark. 351, relied upon by appellants, are entirely different from the facts of this record, and this differentiation makes the doctrine of that case inapplicable here. The decree is affirmed.